**No. 25-10219**

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT**

———————————

IRFAN KHAN,

Plaintiff-Appellee,

v.

UNITED STATES OF AMERICA,

Defendant-Appellant.

———————————

On Appeal from the United States District Court
for the Southern District of Florida

———————————

**BRIEF FOR APPELLANT**

———————————

BRETT A. SHUMATE
  *Assistant Attorney General*

HAYDEN P. O'BYRNE
  *United States Attorney*

BRAD HINSHELWOOD
SARAH N. SMITH
  *Attorneys, Appellate Staff
  Civil Division, Room 7533
  U.S. Department of Justice
  950 Pennsylvania Avenue NW
  Washington, DC 20530
  (202) 305-0173*

*Khan v. United States of America*, No. 25-10219

## AMENDED CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Eleventh Circuit Rule 26.1-1, counsel for appellant certifies that, to the best of her knowledge, the following list of persons and entities have an interest in the outcome of the appeal:

Altonaga, Cecilia M.

Davis, Kathryn C.

Freeny, Kyle R.

Gomez, Raphael O.

Hanna, Michael N.

Kassa, Alex C.

Khan, Irfan

Leinicke, John S.

Luck, David L.

*Hinshelwood, Brad

Mitnik, Keith R.

Morgan & Morgan, PA

Muslim Legal Fund of America

*O'Byrne, Hayden P.

Raurell, Carlos J.

Reid, Lisette M.

C-1 of 2

*Khan v. United States of America*, No. 25-10219

*Shumate, Brett A.

Sinzdak, Gerard

Smith, Sarah N.

Swift, Charles D.

Tereziu, Ertis

United States of America

I also certify that, to the best of my knowledge, no publicly traded company or corporation has an interest in the outcome of this case or appeal.


> /s/ *Sarah N. Smith*
> Sarah N. Smith


*Additions to previous certificate marked with an asterisk.

## STATEMENT REGARDING ORAL ARGUMENT

The United States believes that oral argument would aid in this Court's consideration of this appeal and respectfully requests oral argument.

# TABLE OF CONTENTS

**Page**

STATEMENT OF JURISDICTION ................................................................. 1

STATEMENT OF THE ISSUES ..................................................................... 1

STATEMENT OF THE CASE ......................................................................... 2

      A.    Statutory Background ................................................................... 2

      B.    Factual Background...................................................................... 3

      C.    Prior Proceedings ........................................................................ 4

      D.    Standard of Review ...................................................................... 9

SUMMARY OF ARGUMENT ......................................................................... 9

ARGUMENT .................................................................................................. 11

I.    The District Court Erred in Concluding that FBI Special Agents Caused Plaintiff's Prosecution. ................................................................................. 11

II.   The District Court Erred in Concluding that Plaintiff's Prosecution Was Not Supported by Probable Cause. ............................................................... 18

      A.    Probable cause supported plaintiff's prosecution. ..................... 19

      B.    The district court evaluated probable cause under an incorrect legal standard............................................................................... 27

III.  The District Court Erred in Awarding Plaintiff Damages for Decisions Made by Government Attorneys. ................................................................... 36

CONCLUSION ............................................................................................... 39

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ii

# TABLE OF AUTHORITIES

**Cases:**                                                                                                           **Page(s)**

*Alvarez-Mena v. Miami-Dade County,*
    305 So. 3d 63 (Fla. Dist. Ct. App. 2019) ............................................................... 26, 29

*Arnsberg v. United States,*
    757 F.2d 971 (9th Cir. 1985) .............................................................................................. 37

*Bello v. Johnson,*
    442 F. App'x 477 (11th Cir. 2011) .................................................................................... 32

*Burns v. GCC Beverages, Inc.,*
    502 So. 2d 1217 (Fla. 1986) ................................................................................... 26, 31, 32

*City of Clearwater v. Williamson,*
    938 So. 2d 985 (Fla. Dist. Ct. App. 2006) ...................................................... 18, 19, 28

*Curtis v. State,*
    748 So. 2d 370 (Fla. Dist. Ct. App. 2000) ................................................................... 18

*Debrincat v. Fischer,*
    217 So. 3d 68 (Fla. 2017) ............................................................................. 5, 11, 18, 19

*Delacruz v. State,*
    603 So. 2d 707 (Fla. Dist. Ct. App. 1992) ................................................................... 30

*District of Columbia v. Wesby,*
    583 U.S. 48 (2018) ................................................................................... 18, 27, 28, 29

*Erp v. Carroll,*
    438 So. 2d 31 (Fla. Dist. Ct. App. 1983) ..................................................................... 38

*Eubanks v. Gerwen,*
    40 F.3d 1157 (11th Cir. 1994) ......................................................................................... 13

*Evans v. Chalmers,*
    703 F.3d 636 (4th Cir. 2012) ........................................................................................... 13

*Floyd v. Stoumbos,*
    No. 22-11679, 2023 WL 2592297 (11th Cir. Mar. 22, 2023) .................................... 31

*Glass v. Parrish,*
    51 So. 2d 717 (Fla. 1951) ................................................................................................. 33

*Harris v. Lewis State Bank,*
    482 So. 2d 1378 (Fla. Dist. Ct. App. 1986) ............................................. 16, 17

*J.J. v. State,*
    312 So. 3d 116 (Fla. Dist. Ct. App. 2020) ............................................. 27, 28

*Johnson v. State,*
    660 So. 2d 648 (Fla. 1995) ............................................................... 35

*McCraney v. Barberi,*
    677 So. 2d 355 (Fla. Dist. Ct. App. 1996) ............................................. 12

*Miami-Dade County v. Asad,*
    78 So. 3d 660 (Fla. Dist. Ct. App. 2012) ............................................. 12, 17

*Paez v. Mulvey,*
    915 F.3d 1276 (11th Cir. 2019) ................................................. 19, 27, 35

*Rankin v. Evans,*
    133 F.3d 1425 (11th Cir. 1998) ................................................. 18, 30, 33

*Rehberg v. Paulk,*
    566 U.S. 356 (2012) ....................................................................... 13, 14

*Tartell v. South Fla. Sinus & Allergy Ctr., Inc.,*
    790 F.3d 1253 (11th Cir. 2015) ......................................................... 9

*Trupei v. United States,*
    304 F. App'x 776 (11th Cir. 2008) ................................................. 12, 37

*United States v. Kapordelis,*
    569 F.3d 1291 (11th Cir. 2009) ......................................................... 32

*United States v. Khan,*
    794 F.3d 1288 (11th Cir. 2015) ......................................................... 4

*Ware v. United States,*
    971 F. Supp. 1442 (M.D. Fla. 1997) ................................... 5, 15, 16, 38

*Williams v. Aguirre,*
    965 F.3d 1147 (11th Cir. 2020) ......................................................... 30

*Williams v. Miami-Dade Police Dep't,*
    297 F. App'x 941 (11th Cir. 2008) ..................................................... 13

**U.S. Constitution:**

Amend. IV ........................................................................................................... 30

**Statutes:**

Federal Tort Claims Act (FTCA):
   28 U.S.C. § 1346(b) ....................................................................................... 1
   28 U.S.C. § 1346(b)(1) ................................................................................... 2
   28 U.S.C. § 2680 ............................................................................................. 2
   28 U.S.C. § 2680(h) .......................................................................... 2, 3, 11, 37

Foreign Intelligence Surveillance Act,
   50 U.S.C. § 1801 *et seq.* ................................................................................. 3

28 U.S.C. § 1291 ................................................................................................ 1

28 U.S.C. § 1331 ................................................................................................ 1

42 U.S.C. § 1983 .............................................................................................. 13

**Rule:**

11th Cir. R. 28-5 ............................................................................................... 1

**Other Authority:**

Fla. Jur. 2d *False Imprisonment* § 39 (1995) ......................................................... 38

## STATEMENT OF JURISDICTION

Plaintiff invoked the district court's jurisdiction under 28 U.S.C. §§ 1331, 1346(b) in this action under the Federal Tort Claims Act (FTCA).  The district court entered final judgment in favor of plaintiff on November 25, 2024.  Dkt. 407, at 1.[1]  The United States entered a timely notice of appeal on January 22, 2025.  Dkt. 418, at 1.  This Court has jurisdiction pursuant to 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

Plaintiff was arrested and detained after a federal grand jury indicted him on charges of conspiring to provide and providing material support to the Pakistani Taliban.  After the government dismissed the charges, plaintiff sued under the FTCA, alleging that he was maliciously prosecuted by the Federal Bureau of Investigation (FBI) agents who investigated and testified against him.  After a bench trial, the district court held that the government, through the FBI agents, maliciously prosecuted plaintiff and awarded $6.28 million in damages.  The questions presented are:

1.  Whether the district court correctly concluded that the FBI agents were the legal cause of plaintiff's prosecution.

---

[1] References to the record are to the district court's docket number and to the page number of that document generated by the district court's electronic filing system.  11th Cir. R. 28-5.

2. Whether the district court correctly concluded that plaintiff's prosecution was not supported by probable cause.

3. Whether the district court erred in awarding plaintiff damages for decisions made by government attorneys.

## STATEMENT OF THE CASE

### A.     Statutory Background

The FTCA provides a limited waiver of the United States' sovereign immunity and creates a cause of action for certain tort claims "where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."  28 U.S.C. § 1346(b)(1).  The FTCA further provides that the statute's waiver of sovereign immunity "shall not apply" to "[a]ny claim" identified in any of the statute's enumerated exceptions.  *Id.* § 2680.

As relevant here, section 2680(h) generally excepts from the FTCA's waiver of sovereign immunity "[a]ny claim arising out of" various intentional torts, including "false imprisonment, false arrest, malicious prosecution, [and] abuse of process." 28 U.S.C. § 2680(h).  This exception is cabined, however, by a proviso that excludes from the exception's scope claims arising out of false imprisonment, false arrest, malicious prosecution, or abuse of process when they are based on the acts or omissions of "investigative or law enforcement officers."  *Id.*  The proviso defines an investigative or law enforcement officer to mean "any officer of the United States

2

who is empowered by law to execute searches, to seize evidence, or to make arrests for violations of Federal law." *Id.*

### B.    Factual Background

In late 2007, the FBI's Miami field office opened a counterterrorism investigation to determine whether plaintiff's father, Hafiz Khan, and others were providing material support to the Taliban in Pakistan.  Dkt. 410, at 165-67.  The government's evidence consisted primarily of transcripts of telephone calls, intercepted pursuant to the Foreign Intelligence Surveillance Act, 50 U.S.C. § 1801 *et seq*.  *See* Dkt. 410, at 173.  The recorded telephone conversations were in Pashto and Urdu.  *Id.* at 174.  Because the investigating agents did not speak those languages, they relied upon FBI linguists to interpret the calls.  *Id.* at 174-75.  The government also subpoenaed records from the financial institutions used by plaintiff and others to send money to Pakistan.  *See id.* at 173.

In 2011, a federal grand jury indicted plaintiff, his father, and several other family members on charges of conspiring to provide and providing material support to the Pakistani Taliban.  Dkt. 362-1.  The indictment alleged four overt acts involving plaintiff.  *Id.*  Overt Act 1 alleged that plaintiff made three wire transfers of $990, $980, and $980, respectively, to Pakistan.  *Id.* at 7.  Overt Act 5 alleged that plaintiff participated in a conversation with his father, Hafiz, in which Hafiz called for an attack on the Pakistani Assembly that would resemble the 2008 suicide bombing of the Marriott hotel in Islamabad, Pakistan.  *Id.*  Overt Act 6 alleged that plaintiff wired

3

$500 to his sister and co-conspirator, Amina, in Pakistan.  *Id.*  And Overt Act 14 alleged that plaintiff participated in a phone call with his father in which both men discussed sending money to the "Sharia people" and Hafiz called for Pakistani government officials to be killed.  *Id.* at 8.  FBI Special Agent Janssen testified to plaintiff's actions with respect to these overt acts before the grand jury.  Dkt. 408, at 99.

After the grand jury indicted plaintiff, he was arrested.  Dkt. 396, at 1.  He was detained at several facilities before being transferred to the Federal Detention Center in Miami, where he was placed in a special housing unit.  *Id.* at 2.  FBI Special Agent Ferlazzo testified at plaintiff's detention hearing.  Dkt. 412, at 59.  Plaintiff was released after 317 days, and shortly thereafter, the government dismissed charges against plaintiff without prejudice.  Dkt. 396, at 3; Dkt. 371, at 7.  The government continued its prosecution of plaintiff's father, who was convicted and sentenced to 25 years in prison.  *United States v. Khan*, 794 F.3d 1288, 1293 (11th Cir. 2015).

### C.    Prior Proceedings

Plaintiff sued the United States under the FTCA, asserting claims for false arrest and malicious prosecution under Florida law.  Dkt. 39.  Plaintiff alleged that the government, through the FBI agents, "showed intentional and/or reckless disregard for the truth and/or fabricated evidence to obtain Khan's indictment, arrest warrant and continued detention."  *Id.* at 3.  The district court dismissed plaintiff's false arrest

claim but allowed his malicious prosecution claim to proceed to a bench trial.  Dkt. 73.

**1.**  Following the trial, the district court found the government liable for malicious prosecution.  Dkt. 371.  At issue in this appeal are two elements a plaintiff must establish to prevail on a malicious prosecution claim in Florida: (1) that the defendant was the legal cause of plaintiff's prosecution and (2) that no probable cause existed for that prosecution.  *Debrincat v. Fischer*, 217 So. 3d 68, 70 (Fla. 2017).

The district court found that the FBI agents who investigated plaintiff and testified before the grand jury and at his detention hearing were the legal cause of his prosecution.  Dkt. 371, at 13.  The court rejected the government's argument that the decision to prosecute plaintiff was made independently by federal prosecutors, for whose acts the United States has not waived its sovereign immunity.  *Id.* at 9, 12-13.  Citing *Ware v. United States*, 971 F. Supp. 1442 (M.D. Fla. 1997), the district court reasoned that law enforcement officers can be liable for malicious prosecution even when they are not the prosecutors of record if the court finds that the officers "played a key role or took an active part in the proceedings."  Dkt. 371, at 12.  The court concluded that the FBI agents played "key roles" and "took active part" in plaintiff's prosecution based on its findings that (1) the case agent who testified before the grand jury, Special Agent Janssen, "manage[d] and overs[aw] everything that happen[ed] in the investigation" and had "overall responsibility" for the case; (2) case agents "play an active role in crafting grand jury testimony and can push back against unsupported

statements"; and (3) FBI agents testified before the grand jury and at plaintiff's detention hearing and they were "active investigators" before and after those proceedings. *Id.* at 12-13. The court rejected the government's argument that law enforcement officers can only be liable for malicious prosecution where they make the decision to prosecute or improperly influence that decision. *Id.* at 13-14.

The court also held that plaintiff's prosecution was not supported by probable cause. Dkt. 371, at 25. Although the government argued that the court should consider all evidence known to the agents at the time of the indictment, the court limited its analysis to the four overt acts involving plaintiff that were presented to the grand jury. The court analyzed each overt act individually, inquiring whether the government had probable cause to characterize each act as part of a conspiracy. *Id.* at 17-25.

Regarding Overt Act 1, which alleged that plaintiff made wire transfers of $990, $980, and $980 to Pakistan, the district court concluded that the government did not have probable cause to believe that the transfers were part of a conspiracy to aid the Taliban. Dkt. 371, at 17. Before the grand jury, Special Agent Janssen testified that the recipient of the funds was Akbar Hussain, but he said nothing further about Hussain's identity. *Id.* The court reasoned that although public source information indicated that Akbar Hussain was a Taliban leader, his name is a common one and the conspirators were unlikely to have sent money openly to a known Taliban commander. *Id.* at 17-18. The court also concluded that the government failed to

6

conduct an adequate investigation into Hussain's identity, pointing to evidence obtained after the indictment that tended to suggest that Hussain was a relative of plaintiff's wife. *Id.* at 18-20.

Overt Act 5 alleged that plaintiff participated in a conversation with his father, Hafiz Khan, in which Hafiz called for an attack on the Pakistani Assembly that would resemble the 2008 suicide bombing of the Marriott hotel in Islamabad, Pakistan. Dkt. 371, at 20. The court concluded that Special Agent Janssen "affirmed" that both Hafiz Khan and plaintiff "discussed the need" for a similar attack but that there was no probable cause "for the Government's conclusion" that plaintiff called for an attack. *Id.* at 21.

The district court similarly concluded that the government did not have probable cause to believe that plaintiff transferred $500 to his sister, Amina, as part of a conspiracy to aid the Taliban, as alleged in Overt Act 6. Dkt. 371, at 21-22. The court found that Special Agent Janssen testified that the money was solicited for the Taliban and was sent to Amina to avoid suspicion. *Id.* at 21. The court held that the government did not have probable cause to suspect that the money was intended for the Taliban, reasoning that the government had not provided any recorded calls in which plaintiff himself discussed sending money to the Taliban and that a "reasonable" interpretation of the evidence is that plaintiff sent the money to his sister for humanitarian reasons. *Id.* at 22.

Finally, Overt Act 14 alleged that plaintiff participated in a phone call with his father, in which both men discussed sending money to the "Sharia people" and Hafiz Khan called for Pakistani government officials to be killed. Dkt. 371, at 23. Special Agent Janssen did not testify before the grand jury as to the meaning of "Sharia people." *Id.* The court concluded that the government did not have probable cause at the time of the indictment to believe that "Sharia people" referred to the Pakistani Taliban and that "events after the indictment undermine that conclusion." *Id.* at 23-24. The court also determined that there was no probable cause to believe that Hafiz was calling for an attack on Pakistani officials "or that Plaintiff participated in such a call." *Id.* at 25.

The court concluded that "[a]t the time it sought the indictment, the Government did not have probable cause for any of the overt acts alleged in the indictment." Dkt. 371, at 25. The court further held that the government "failed to conduct a reasonable investigation and then made material misrepresentations when it, through an agent, testified about the overt acts." *Id.* at 25-26.

**2.** The district court held a separate trial on damages and awarded plaintiff $6.28 million, including $6 million for emotional distress. Dkt. 396. The court found that plaintiff suffered emotional distress as a result of his arrest, prosecution, and detention. *Id.* at 16. The court also found that plaintiff suffered emotional distress because the government (1) dismissed charges without prejudice and (2) maintained

8

plaintiff's guilt as part of its defense of this case. *Id.* at 16-17. The court held that plaintiff was entitled to "additional compensation" for these injuries. *Id.* at 17.

### D.    Standard of Review

After a bench trial, this Court reviews the district court's conclusions of law de novo and its factual findings for clear error. *Tartell v. South Fla. Sinus & Allergy Ctr., Inc.*, 790 F.3d 1253, 1257 (11th Cir. 2015). A factual finding is clearly erroneous "if, after viewing all the evidence," this Court is "left with the definite and firm conviction that a mistake has been committed." *Id.* (quotation marks omitted).

## SUMMARY OF ARGUMENT

**I.** The district court erred when it held that the FBI special agents caused plaintiff's prosecution. Under Florida law, law enforcement officers do not legally cause a prosecution unless they make the decision to prosecute or improperly influence the prosecutor's decision by, for example, pressuring her to bring charges or withholding exculpatory evidence. Here, uncontroverted evidence at trial indicated that prosecutors, after reviewing all the government's evidence, decided to prosecute plaintiff. Under Florida law, the prosecutor's independent decision insulates the FBI agents from liability for malicious prosecution.

**II.** The district court also erred when it concluded that plaintiff's prosecution was not supported by probable cause.

**A.** The district court's judgment should be reversed, because plaintiff failed to satisfy his burden of proving an absence of probable cause to initiate his prosecution.

9

The government presented extensive evidence at trial demonstrating that at the time of the indictment, the FBI agents reasonably believed that plaintiff had wired money to Pakistan that was intended for the Taliban and conspired with others to do the same. That evidence included phone calls describing funds sent by plaintiff as being "for the Mujahideen" and plaintiff's own father describing him as a Taliban supporter. The evidence, viewed as a whole, was sufficient to satisfy probable cause.

**B.** The district court analyzed probable cause under an incorrect legal standard. Instead of assessing whether all facts and circumstances then known to the FBI agents provided probable cause for plaintiff's prosecution, the district court limited its analysis to the four overt acts involving plaintiff that were presented to the grand jury. The district court compounded that error by assessing probable cause for each overt act individually, rather than assessing those acts as part of the totality of the circumstances, as Florida law requires. The district court further erred by suggesting that plaintiff could establish a lack of probable cause for his prosecution by showing that the FBI agent who testified before the grand jury made material misrepresentations. If the FBI agent lied to the grand jury, that would provide good reason not to defer to the grand jury's assessment of probable cause, but it would not, standing alone, establish a lack of probable cause to prosecute plaintiff. Regardless, the district court clearly erred in finding that the FBI agent made material misrepresentations before the grand jury.

10

**III.** The district court also erred in its award of damages. The court incorrectly held that plaintiff was entitled to damages for emotional distress he experienced due to the government's decision to dismiss charges without prejudice and its decision to maintain plaintiff's guilt in the civil action. Such damages are not available to plaintiff in this FTCA suit because those decisions were not made by law enforcement officers but, rather, by government attorneys, whose actions are not covered by the FTCA's waiver of sovereign immunity. Such damages are also improper under Florida law, which limits damages in malicious prosecution actions to the natural and probable consequences of criminal prosecution. Unlike arrest and confinement, dismissal without prejudice and positions taken in civil litigation are not natural incidents of a criminal prosecution. Plaintiff accordingly cannot recover for any distress he experienced as a result of those events.

## ARGUMENT

### I.    The District Court Erred in Concluding that FBI Special Agents Caused Plaintiff's Prosecution.

**1.** To prevail on a malicious prosecution claim, the plaintiff must establish that the defendant was the legal cause of his prosecution. *Debrincat v. Fischer*, 217 So. 3d 68, 70 (Fla. 2017). Because the United States has only waived its sovereign immunity for malicious prosecution claims arising from the acts or omissions of "investigative or law enforcement officers," 28 U.S.C. § 2680(h), a plaintiff alleging malicious prosecution by the United States must show that such officers—as opposed to federal

11

prosecutors—caused his prosecution. *Trupei v. United States*, 304 F. App'x 776, 784 (11th Cir. 2008) (per curiam) (explaining that federal prosecutors "do not qualify as 'investigative or law enforcement officers' within the meaning of 28 U.S.C. § 2680(h)" (alteration omitted)).

Under Florida law, an investigative or law enforcement officer cannot be held liable for malicious prosecution if "it was the Assistant State Attorney, not [the police officer], who made the decision to prosecute." *Miami-Dade County v. Asad*, 78 So. 3d 660, 665, 667 (Fla. Dist. Ct. App. 2012). In *Miami-Dade County v. Asad*, the Florida court of appeals held that a police officer was "insulated from a malicious prosecution claim as a matter of law" where the Assistant State Attorney independently reviewed the evidence gathered by the officer, determined that there was probable cause, and made the decision to file charges. *Id.* at 665-67 (formatting altered); *see also McCraney v. Barberi*, 677 So. 2d 355, 357 (Fla. Dist. Ct. App. 1996) (explaining that a defendant does not cause legal proceedings where he merely provides information to the proper authorities, who then independently investigate and decide whether to prosecute).

Only in limited circumstances can an officer be held liable for a prosecution. For example, if an investigating officer "gave information to the [prosecuting] attorney's office which he knew to be false," and "such information unduly influenced the decision of the state to prosecute," then the officer can be held liable for malicious prosecution. *McCraney*, 677 So. 2d at 356. This Court, applying Florida law, has accordingly explained that investigating officers are not the legal cause of a

12

proceeding where there is "no evidence that they had anything to do with the decision to prosecute" nor evidence that they "'improperly influenced' that decision." *Williams v. Miami-Dade Police Dep't*, 297 F. App'x 941, 947 (11th Cir. 2008) (per curiam).

Florida's rule regarding malicious-prosecution liability for investigating officers is consistent with the common law, which similarly does not permit liability against investigative officers where a prosecutor independently decided to bring charges, unless there is evidence that the officer improperly influenced that decision by, for example, lying to the prosecutor or withholding exculpatory evidence. *See Eubanks v. Gerwen*, 40 F.3d 1157, 1160-61 (11th Cir. 1994) (directing summary judgment for defendant-officers in malicious prosecution action brought under 42 U.S.C. § 1983 where there was no evidence that the defendants were "responsible for the decision to prosecute" or "improperly influenced the decision to prosecute"); *Evans v. Chalmers*, 703 F.3d 636, 649 (4th Cir. 2012) (collecting cases and articulating the common-law "rule" that "a prosecutor's independent decision to seek an indictment breaks the causal chain" between the officer's alleged misconduct and plaintiff's injury "unless the officer has misled or unduly pressured the prosecutor"). Nor, under the common law, does a law enforcement officer "make the critical decision to initiate a prosecution" by testifying before the grand jury. *Rehberg v. Paulk*, 566 U.S. 356, 371 (2012). Although a "case agent who has performed or supervised most of the investigative work in a case may serve as an important witness in the grand jury

13

proceeding and may very much want the grand jury to return an indictment," such a witness "does not make the decision to press criminal charges" by testifying. *Id.*

Here, the government offered unrebutted evidence that federal prosecutors independently assessed the evidence and decided to seek plaintiff's indictment. Special Agent Janssen testified that the U.S. Attorney's Office was made aware of and became involved in the investigation "early on." Dkt. 410, at 166. The FBI met regularly with the U.S. Attorney's Office to discuss developments in the case, and all evidence gathered by the FBI was shared with prosecutors. *Id.* at 169, 173. Discussing the entities' respective roles in the investigation, Special Agent Janssen explained that "the FBI produced the evidence" and the U.S. Attorney's Office "ma[de] prosecution decisions." *Id.* at 171; *see also id.* at 152 (Special Agent Janssen testifying that "the prosecution is the one that decided to prosecute Irfan Khan"); Dkt. 409, at 203 (Special Agent Janssen testifying that prosecutors decided which overt acts to present to the grand jury). No evidence presented at trial suggested that the FBI agents provided information they knew to be false, withheld exculpatory information, or otherwise misled prosecutors or improperly influenced their decision.

The district court's factual findings on this issue are not to the contrary. The court found (1) that Special Agent Janssen "manage[d] and overs[aw] everything that happen[ed] in the investigation" and had "overall responsibility"; (2) that FBI agents help craft grand jury testimony and can "push back against unsupported statements"; and (3) that FBI agents testified before the grand jury and at plaintiff's detention

14

hearing and were "active investigators before and after" those proceedings. Dkt. 371, at 12-13. None of those findings indicate that the FBI agents made the decision to prosecute plaintiff, nor that the agents improperly influenced the prosecutor's decision.[2] In fact, the district court recognized that the prosecutor who handled the criminal case had provided a declaration "indicating that none of the special agents who investigate[d] Plaintiff participated in the decisions to charge him or to continue the prosecution following his indictment, nor did any of the special agents improperly influence those decisions." *Id.* at 13; *see* Dkt. 289-2 (declaration of Assistant U.S. Attorney Sivashree Sundaram). Although the court noted that the prosecutor did not testify at trial, the court did not question the truthfulness of her declaration. *See* Dkt. 371, at 13. Given the government's unrebutted evidence and the facts found by the district court, the court erred in holding that the FBI special agents caused plaintiff's prosecution.

**2.** The district court erroneously reasoned that the FBI agents who investigated plaintiff and testified against him were the legal causes of his prosecution because they "played key roles" in the prosecution and "took active part in it." Dkt. 371, at 13. The court relied on *Ware v. United States*, 971 F. Supp. 1442 (M.D. Fla. 1997), in which the court concluded (in the course of rejecting a malicious

---

[2] Indeed, in the district court's separate opinion on damages, the court expressly noted that "Plaintiff's emotional distress is not rooted in the awareness that law enforcement deliberately planted or fabricated evidence against him." Dkt. 396, at 21.

prosecution claim on other grounds) that the FBI agent who "produced and gathered" the evidence against the plaintiff and played an "active, pivotal role" in his investigation and prosecution was the legal cause of the criminal proceedings against him. *Id.* at 1461-62.

To the extent *Ware* suggests that a law enforcement officer causes a criminal prosecution simply by investigating and gathering evidence, *Ware* misapplies Florida tort law. The *Ware* court cited one Florida case, *Harris v. Lewis State Bank*, 482 So. 2d 1378 (Fla. Dist. Ct. App. 1986), for the proposition that a defendant "cannot escape liability simply because [he] 'was not the prosecutor of record.'" 971 F. Supp. at 1462 (quoting *Harris*, 482 So. 2d at 1381). But what *Harris* explains is that a defendant who knowingly gave false information to a prosecutor "cannot escape liability by showing he was not the prosecutor of record." 482 So. 2d at 1381. That is because where the defendant withheld "pertinent information" from the prosecutor or misrepresented facts, there was "no intelligent exercise of the [prosecutor's] discretion" to prosecute. *Id.* at 1381 n.9. By contrast, where the defendant made a "full, complete, and accurate disclosure" to the prosecutor, such that the decision to prosecute was "left entirely to his discretion," he cannot be held liable for malicious prosecution. *Id.* "The test is whether the defendant's action was the proximate and efficient cause" of the prosecution. *Id.* at 1381. *Harris* is thus entirely consistent with the decisions of other Florida courts discussed above, *supra* pp. 12-13, that recognize that a prosecutor's independent decision to prosecute insulates an officer-defendant from malicious-

prosecution liability, barring evidence that the officer improperly influenced that decision. As noted above, the district court did not find that the FBI agents in this case misled prosecutors, nor was there any evidence at trial that would support such a finding.

The district court nevertheless rejected the government's argument that the FBI agents were not the legal causes of plaintiff's prosecution because they did not make the decision to prosecute or improperly influence that decision, reasoning that that rule did not apply because "the agents here were much more involved in building the case against Plaintiff." Dkt. 371, at 14. The district court's decision misstates the relevant law. The question is not how "involved" the agents were in gathering evidence and "building the case"; the question is whether the agents *caused* plaintiff's prosecution, either by deciding to prosecute him or by improperly influencing the prosecutor's decision such that there was "no intelligent exercise of [her] discretion" to prosecute. *Harris*, 482 So. 2d at 1381 n.9. Here, the government presented unrebutted evidence that prosecutors, after reviewing the evidence collected by the FBI, decided to indict plaintiff. Their independent decision "insulate[s]" the FBI agents from liability, and the district court's decision should accordingly be reversed. *Miami-Dade County*, 78 So. 3d at 665.

Indeed, the district court's reasoning would have untenable consequences that cannot be squared with Florida law. Law enforcement officers always play "key role[s]" in investigating suspected criminal behavior and gathering evidence in support

17

of a potential prosecution. They likewise frequently testify in grand jury proceedings. Under the district court's reasoning, plaintiffs could bring malicious prosecution claims against law enforcement officers as a matter of course. As explained above, that is not the law in Florida.

## II.    The District Court Erred in Concluding that Plaintiff's Prosecution Was Not Supported by Probable Cause.

The plaintiff in a malicious prosecution action must show "an absence of probable cause" for his prosecution. *Debrincat*, 217 So. 3d at 70 (quotation marks omitted). Probable cause exists when, considering the "totality of circumstances," there are "reasonable grounds to believe that the suspect has committed a felony." *City of Clearwater v. Williamson*, 938 So. 2d 985, 989 (Fla. Dist. Ct. App. 2006) (quotation marks omitted). Probable cause "does not require absolute certitude." *Curtis v. State*, 748 So. 2d 370, 374 (Fla. Dist. Ct. App. 2000). It requires merely a "probability or substantial chance of criminal activity, not an actual showing of such activity." *District of Columbia v. Wesby*, 583 U.S. 48, 57 (2018) ("Probable cause is not a high bar." (quotation marks omitted)). Florida law evaluates probable cause under an objective standard, asking whether "a reasonable man would have believed [probable cause existed] had he known all of the facts known by the officer." *Rankin v. Evans*, 133 F.3d 1425, 1433 (11th Cir. 1998) (alteration in original) (quotation marks omitted).

18

An investigating officer must conduct a "*reasonable* investigation" to establish probable cause, but he is not required to "take every conceivable step to eliminate the possibility of convicting an innocent person." *Williamson*, 938 So. 2d at 990. In determining whether probable cause exists, a law enforcement officer "is not required to resolve every inconsistency found in the evidence," nor is he required to "resolve legal questions" or "weigh the viability" of defenses. *Paez v. Mulvey*, 915 F.3d 1276, 1286 (11th Cir. 2019). As long as "it is reasonable to conclude from the body of evidence as a whole that a crime was committed, the presence of some conflicting evidence or a possible defense will not vitiate a finding of probable cause." *Id.*

## A.    Probable cause supported plaintiff's prosecution.

Considering the totality of the circumstances and all facts known to the FBI agents at the time of the indictment, plaintiff failed to carry his burden of showing the "absence of probable cause" for his prosecution. *Debrincat*, 217 So. 3d at 70 (quotation marks omitted). To the contrary, the facts known to the officers at the time of the indictment provided them with ample probable cause to believe that plaintiff knowingly sent money or conspired with others to send money to the Pakistani Taliban.

The FBI began its investigation into Hafiz Khan, plaintiff's father, after it received reports that Hafiz and his family members were sending money to the Pakistani Taliban, which at that time was waging war against the Pakistani government. *See* Dkt. 410, at 164. The government obtained a warrant to wiretap

19

Hafiz's telephone, and it recorded thousands of conversations between Hafiz and his family and friends, including plaintiff. *See id.* at 173. The recorded calls were in Pashto and Urdu, and the FBI agents, who spoke neither language, relied on FBI linguists to interpret the calls. *Id.* at 174-75. The government's evidence also included financial records reflecting wire transfers from plaintiff and others to Pakistan. *See id.* at 173. The evidence gathered through these means established as a matter of law that probable cause supported plaintiff's prosecution.

*Wire Transfer to Ziau Aldeen*

On August 24, 2009, Hafiz Khan left a voicemail for a man named Mohammad Iqbal, informing Iqbal that he was sending "some amount from America" that was for "the Mujahideen," *i.e.*, for those waging jihad. Dkt. 358-2, at 2 (Def. Ex. 5). Western Union records reflect that Hafiz transferred $995 that day. Dkt. 362-4, at 1 (Joint Ex. 4). Three days later, on August 27, plaintiff and his father discussed the wire transfer to Mohammad Iqbal. Dkt. 358-10, at 2 (Def. Ex. 18). Plaintiff, relaying a message from his brother Ikram, informed his father that the money should be sent to a different recipient, Ziau Aldeen, and that Hafiz needed to go to the Western Union office to change the recipient. *Id.* at 2-4 (Def. Ex. 18). The Western Union records reflect that Hafiz, in accordance with plaintiff's instructions, changed the recipient of the funds—which he described in a recorded call as being for "the Mujahideen"—to Ziau Aldeen. Dkt. 411, at 68-72; Dkt. 362-4, at 4 (Joint Ex. 4).

20

*Wire Transfer to Muhammad Ramazan*

The FBI gathered evidence that plaintiff was similarly involved in a separate wire transfer to Pakistan ultimately intended for the Taliban.  On July 8, 2009, the government recorded a call between Hafiz and his daughter, Amina, in which Amina instructed her father to collect money for the Taliban by misrepresenting that the funds were for innocent victims.  Dkt. 411, at 78-81 (testimony of Special Agent Janssen); Dkt. 358-4, at 13, 17-18 (Def. Ex. 8).  Amina stated in that call that she gave plaintiff the same instruction.  Dkt. 358-4, at 13 (Def. Ex. 8).  Hafiz agreed that he would solicit funds in the manner Amina advised and discussed pooling donations with plaintiff, "if Irfan does that thing."  *Id.* at 17 (Def. Ex. 8); Dkt. 411, at 80-81.

Three days later, on July 11, Hafiz solicited funds from a doctor who attended his mosque.  Although Hafiz told the doctor he was collecting funds for innocent victims, on the very same day he solicited the funds, he told his son Izhar Khan, whom he sent to collect the donation, that the money was "for the Mujahideen."  Dkt. 411, at 82-87; Dkt. 358-7, at 4-5 (Def. Ex. 12) (call between Hafiz and doctor); Dkt. 358-1, at 2 (Def. Ex. 4) (voicemail left by Hafiz Khan for Izhar Khan).  On July 14, plaintiff and Hafiz discussed potential recipients in Pakistan for $500 Hafiz had collected, which included $300 he solicited from the doctor that he described as "money for the Mujahideen."  Dkt. 411, at 89-90; Dkt. 362-19, at 4-5 (Joint Ex. 19); Dkt. 358-1, at 2 (Def. Ex. 4).  One potential recipient they discussed was Muhammad Ramazan, the caretaker of Hafiz's madrasa and mosque.  Dkt. 411, at 90; Dkt. 362-19,

21

at 4 (Joint Ex. 19).  Three days later, on July 17, plaintiff wired $500 to Ramazan. Dkt. 411, at 91-93; Dkt. 358-21 (Def. Ex. 42).

*Wire Transfer to Amina Khan*

On July 10, 2009, plaintiff wired $500 to his sister and co-conspirator, Amina, who lived in Pakistan.  The investigating agents believed that plaintiff did so at the direction of his father and that the money was ultimately intended for Amjad Khan, plaintiff's cousin, who had recently been injured while fighting with the Taliban.  On July 8, Hafiz and plaintiff discussed Amjad Khan and the fact that he had been injured while fighting.  Dkt. 411, at 100-03; Dkt. 362-25, at 2-3 (Joint Ex. 25).  Plaintiff asked his father if Hafiz would be "sending something," and Hafiz replied that he would be sending money to Amina.  Dkt. 411, at 105; Dkt. 362-25, at 4 (Joint Ex. 25).  Later in the conversation, Hafiz asked plaintiff how much he was "going to arrange," and plaintiff replied, "I'll give him two."  Dkt. 411, at 105-06; Dkt. 362-25, at 5 (Joint Ex. 25).  Hafiz directed plaintiff to "give three" instead and said he would "give two" for a total of $500.  Dkt. 411, at 106; Dkt. 362-25, at 6 (Joint Ex. 25).  Two days later, plaintiff wired $500 to Amina.  Dkt. 411, at 106-07; Dkt. 362-4 (Joint Ex. 4).

Contemporaneous calls indicated that Amina, who was "always with the Mujahids," was collecting money for Amjad's recovery, which reinforced the agents' belief that on July 8, plaintiff and his father were discussing a plan to send money to Amina that was ultimately intended for Amjad Khan, the Taliban fighter.  Dkt. 411, at 25, 107-14; Dkt. 362-21, at 15 (Joint Ex. 21); Dkt. 362-12, at 6-8 (Joint Ex. 12); Dkt.

22

362-16, at 7 (Joint Ex. 16).  Although plaintiff argued at trial that he sent money to Amina because she had recently been displaced by the fighting between the Taliban and Pakistani government, Special Agent Janssen explained that he did not believe the money was sent for humanitarian purposes based on contemporaneous calls indicating that Amina was not in need of money.  Dkt. 411, at 115-18.  Two days before plaintiff wired the $500, Amina told her father that all her needs were met and she was living in a "beautiful" house. Dkt. 358-4, at 14-15; (Def. Ex. 8); *see also* Dkt. 362-12, at 6-7 (Joint Ex. 12) (Hafiz Khan telling his son Izhar on July 15, 2009, that Amina "does not have so much need [of money] for herself" (alteration in original)).

*Wire Transfers to Akbar Hussain*

Over a three-week period in 2008, plaintiff made three transfers of $990, $980, and $980, respectively, to Akbar Hussain.  Dkt. 362-4 (Joint Ex. 4).  At the time of the indictment, the FBI suspected that Akbar Hussain was a Taliban commander, based on public source information gathered by the U.S. Attorney's Office and a phone call between Hafiz and another co-conspirator in which the Taliban commander was discussed.  Dkt. 411, at 127.  But Special Agent Janssen testified that regardless of the recipient, the timing and amount of these transactions made them suspicious, because they appeared structured to avoid detection.  *Id.* at 119.  Plaintiff's own expert witness, former FBI Special Agent D'Angelo, agreed.  Dkt. 414, at 183 ("On its face, if I was putting on my FBI hat back in the day, I would find these transactions very suspicious.").  Moreover, on several calls, the co-conspirators discussed sending sums

23

under $1,000, because they believed transfers over that amount would trigger government scrutiny.  Dkt. 411, at 72, 108-09, 121-24.  On one call, plaintiff was identified as the source of that information.  *Id.* at 121-24; Dkt. 358-5, at 6-7 (Def. Ex. 9).  Special Agent Janssen further testified that it was more expensive to send the money over three transactions than to send the money all at once.  Dkt. 411, at 124-25.  And although plaintiff's counsel suggested that plaintiff sent the money as he earned it, the FBI did not believe that plaintiff, who was then working as a taxi driver, earned anywhere close to $1,000 per week.  *Id.*  Special Agent Janssen testified that he could think of no explanation for structuring the transfers in that manner other than to avoid government detection.  *Id.* at 124.  The transfers to Akbar Hussain were thus suspicious, regardless of the recipient's identity, and when considered alongside all facts then known by the FBI agents, they supported probable cause.

The district court erred in concluding that the FBI's investigation into Akbar Hussain's identity was inadequate.  Dkt. 371, at 20.  As explained below, the district court erred in its probable-cause analysis by assessing the transfers to Akbar Hussain in isolation, rather than considering them alongside all the facts and evidence then known to the FBI.  That issue aside, the court failed to grapple with the FBI's reasons for viewing the transfers as suspicious, and the court erroneously determined that the FBI's investigation was inadequate based on "[e]vents following the indictment" and evidence that was not available to the FBI at the time of the indictment.  *Id.* at 18-20.  That included information obtained from plaintiff after his arrest and records

24

concerning Akbar Hussain from the Pakistani government. *Id.* at 19. Special Agent Janssen explained that before the indictment, the FBI unsuccessfully attempted to verify Akbar Hussain's identity by querying its own databases but that the agents could not approach the Pakistani government before the indictment without risking their investigation. Dkt. 409, at 152; Dkt. 411, at 131-32.

*Additional evidence supporting probable cause*

In addition to the wire transfers discussed above, other evidence known to the FBI agents at the time of the indictment supported probable cause. Plaintiff's own father described plaintiff as "with [the] Mujahideen." Dkt. 362-21, at 15 (Joint Ex. 21). On several calls, plaintiff expressed his concern that the government was surveilling the family and suspected them of supporting the Taliban, and he instructed his father not to discuss certain matters on the phone. Dkt. 411, at 149-63; Dkt. 362-24, at 4, 7, 9 (Joint Ex. 24); Dkt. 362-26, at 4 (Joint Ex. 26). Further, on August 20, 2009, plaintiff and Hafiz Khan discussed plans to send money to the "Shariat people," a term the FBI understood to mean the Pakistani Taliban. Dkt. 411, at 32-34; Dkt. 362-13, at 2 (Joint Ex. 13). The FBI's interpretation of "Shariat people" was shaped by contemporaneous calls in which the co-conspirators described "Sharia people" or "Shariat people" as people seeking to establish Sharia in opposition to the Pakistani government—as the Taliban then was—and by the views of FBI linguists, who interpreted the calls for the agents. Dkt. 411, at 14-16, 34-37; Dkt. 358-12, at 2-4 (Def. Ex. 21) (plaintiff and Hafiz discussing whether an injured person was "among

25

the Mujahideen" or "Shariat people" or if he was with the Lashkar, a local militia fighting the Taliban); Dkt. 358-3, at 7-8 (Def. Ex. 6) (co-conspirators discussing whether the courts in Swat Valley are being "operated by the Sharia people" or if they are under "English [Law]" and Hafiz stating that if the courts are not under Sharia Law, then "there needs to be an utmost effort . . . that such bombings take place over them that all their traces are erased" (alterations in original)).  Although plaintiff argued that "Shariat people" referred to family members in need, two FBI linguists who interpreted the phone conversations—and on whose expertise the FBI agents relied—testified (via deposition designation) that the term referred to "people who are trying to establish Sharia" or "people who were supporting the insurgents who were fighting the government."  Dkt. 415, at 163-65; Dkt. 429, at 88.  One of those linguists, Moazzam Shah, explained that he was "sure someone would not refer to [their] family members as 'Sharia people.'"  Dkt. 415, at 172.

Considering the "totality of facts and circumstances," within the FBI agents' knowledge at the time, *Alvarez-Mena v. Miami-Dade County*, 305 So. 3d 63, 68 (Fla. Dist. Ct. App. 2019), plaintiff did not satisfy the "onerous" burden of proving that his prosecution was initiated without probable cause, *Burns v. GCC Beverages, Inc.*, 502 So. 2d 1217, 1219 (Fla. 1986).  The evidence presented at trial was sufficient to warrant a reasonable person to believe that plaintiff had knowingly supported the Pakistani Taliban and had conspired with others to do the same.  And although plaintiff insisted that the FBI misinterpreted his phone calls and that his conduct was innocent,

26

probable cause "is not a high bar." *Wesby*, 583 U.S. at 57 (quotation marks omitted). It is "more than bare suspicion but is less than beyond a reasonable doubt and, indeed, is less than a preponderance of the evidence." *J.J. v. State*, 312 So. 3d 116, 120 (Fla. Dist. Ct. App. 2020) (en banc) (emphasis and quotation marks omitted). Plaintiff did not satisfy his substantial burden of establishing that, in light of all the facts and evidence then known to the FBI, there was not even a "fair probability" that his conduct was criminal. *Id.* (emphasis and quotation marks omitted). The judgment of the district court should accordingly be reversed.

### B. The district court evaluated probable cause under an incorrect legal standard.

In concluding that plaintiff's prosecution was not supported by probable cause, the district court erred in at least three respects. First, the court analyzed whether there was probable cause for each of the four overt acts individually, rather than considering those acts together as part of the "totality of the circumstances." *Paez*, 915 F.3d at 1286. Second, the court erred by limiting its analysis of probable cause to the evidence presented to the grand jury, ignoring other facts known to the FBI agents at the time of the indictment that supported probable cause. Third, the district court indicated that plaintiff could establish a lack of probable cause by proving that Special Agent Janssen made material misrepresentations to the grand jury. That is incorrect as a matter of law, and in any event, the court clearly erred in finding that the testifying agent made material misrepresentations to the grand jury.

**1.** Florida law, like federal law, requires courts assessing probable cause to "examine the totality of circumstances" to determine the reasonableness of an officer's belief that a crime has been committed. *Williamson*, 938 So. 2d at 989. The totality-of-the-circumstances test "requires courts to consider the whole picture," because "the whole is often greater than the sum of its parts—especially when the parts are viewed in isolation." *Wesby*, 583 U.S. at 60-61 (quotation marks omitted). A court thus errs when it considers evidence "in isolation, rather than as a factor in the totality of the circumstances." *J.J.*, 312 So. 3d at 123 (quotation marks omitted); *see also Wesby*, 583 U.S. at 60-61 (explaining that the lower court erred because "[i]nstead of considering the facts as a whole, the panel majority took them one by one").

The district court here failed to examine the totality of the circumstances when assessing probable cause. Instead, the court analyzed each of the four alleged overt acts in isolation, asking whether the government had probable cause to characterize each as an act in furtherance of a criminal conspiracy. *See* Dkt. 371, at 17 (stating, with regards to Overt Act 1, that "because the transaction was alleged to be an overt act in furtherance of a criminal conspiracy, the issue [is] whether there was probable cause for the Government to characterize this transaction as such"); *id.* at 21 (concluding that the government lacked probable cause for Overt Act 5); *id.* at 22 ("turn[ing] to the issue of whether there was probable cause for the Government to characterize" Overt Act 6 as an "overt act in furtherance of a criminal conspiracy"); *id.* at 23 ("[T]he issue is whether there was probable cause for the Government to

28

characterize [Overt Act 14]" as "an overt act in furtherance of a criminal conspiracy."). The court ultimately determined that there was no probable cause to prosecute plaintiff because it found that the "Government did not have probable cause for any of the overt acts alleged in the indictment." *Id.* at 25. That was error. The "totality-of-the-circumstances test 'precludes this sort of divide-and-conquer analysis'" by which the court dismisses facts and evidence because, standing alone, they do not create probable cause. *Wesby*, 583 U.S. at 61. The court was instead required to consider "the totality of the facts and circumstances" in its assessment of probable cause. *Alvarez-Mena*, 305 So. 3d at 68 (quotation marks omitted).

**2.** The district court further erred by limiting its analysis of probable cause to the four overt acts presented to the grand jury. Dkt. 371, at 16-25. At trial, the government presented additional evidence of plaintiff's guilt that was known to the FBI agents at the time of the indictment but was not presented to the grand jury. For example, the government offered evidence indicating that plaintiff was worried that he and his family were being surveilled by the government, as well as evidence that plaintiff believed that transfers under $1,000—like those he sent to Akbar Hussain— would not trigger government scrutiny. Dkt. 411, at 121-23, 150-54. The government also presented evidence that plaintiff and his father had conferred regarding additional transfers of money to Pakistan and that plaintiff's father had described those funds as being sent "for the Mujahideen." *Id.* at 67-71. And the government presented a telephone conversation in which Hafiz described plaintiff as

29

being "with [the] Mujahideen." *Id.* at 25; Dkt. 362-21, at 15 (Joint Ex. 21).  In

ignoring this evidence and focusing only on the four overt acts presented to the grand

jury, the court failed to consider "all of the facts known" by the agents, as Florida law

requires.  *Rankin*, 133 F.3d at 1433 (quotation marks omitted).

Although the district court did not explain why it focused its probable cause

analysis solely on the alleged overt acts, the court stated that it was "rely[ing]" on

*Delacruz v. State*, 603 So. 2d 707, 709-10 (Fla. Dist. Ct. App. 1992), "where the Court

noted that testimony from a separate hearing cannot be used to bolster the affidavit

that was before the magistrate who issued the warrant because the magistrate could

not have issued the warrant on the basis of information not before it." Dkt. 371, at

16.  *Delacruz* does not justify the district court's approach here.  *Delacruz* was a

criminal case concerning whether the State's search warrant was supported by

probable cause as required by the Fourth Amendment, not a malicious prosecution

case.  603 So. 2d at 708-09.  The relevant distinction is that a person seeking to show

that he was unconstitutionally searched or seized pursuant to a warrant must show

that the warrant was issued without probable cause, which requires an inquiry into the

sufficiency of the information presented to the issuing magistrate.  *See* U.S. Const.

amend. IV ("no Warrants shall issue, but upon probable cause"); *Williams v. Aguirre*,

965 F.3d 1147, 1162 (11th Cir. 2020) (explaining that courts evaluating whether a

seizure pursuant to legal process violates the Fourth Amendment are to "examine

whether 'the judicial officer issuing such a warrant [was] supplied with sufficient

information to support an independent judgment that probable cause exists for the warrant'" (alteration in original)).

By contrast, a malicious prosecution claim requires the plaintiff to show that the defendant lacked probable cause to initiate legal proceedings. *Burns*, 502 So. 2d at 1219 (The malicious-prosecution plaintiff bears the "onerous requirement of proving that the criminal proceeding was initiated by the defendant without probable cause."); *see also Floyd v. Stoumbos*, No. 22-11679, 2023 WL 2592297, at *2 (11th Cir. Mar. 22, 2023) (per curiam) (interpreting Florida law to "evaluate probable cause from the perspective of the malicious prosecution defendant"). The issue here is thus not whether the evidence before the grand jury was sufficient to establish probable cause, but whether the FBI agents had probable cause to believe at the time of the indictment that plaintiff had committed a crime. That inquiry requires consideration of all facts and evidence then known by the agents, and the district court erred by cabining its analysis to the overt acts presented to the grand jury.

**3.** The district court also erred by suggesting that plaintiff could establish a lack of probable cause by proving that the testifying agent made "bad faith misrepresentations" to the grand jury. Dkt. 371, at 15-16. If the agent had lied to the grand jury, that would provide good reason not to defer to the grand jury's finding of probable cause. *See Burns,* 502 So. 2d at 1218 ("[A] magistrate's finding of probable cause after an adversary hearing constitute[s] a conclusive presumption of the existence of probable cause in a subsequent malicious prosecution action, absent

31

fraud or other corrupt means employed to obtain the warrant.").[3]  But

misrepresentations made to the grand jury, on their own, do not establish a lack of

probable cause to prosecute plaintiff at the time of the indictment.  That is because, as

explained above, the question in a malicious prosecution action under Florida law is

whether the defendant had probable cause to initiate the prosecution, not whether the

grand jury's indictment was properly obtained.  *Id.* at 1219.  But even in malicious

prosecution actions brought under § 1983 challenging the constitutionality of

plaintiff's arrest pursuant to a warrant, a finding of misrepresentations or omissions in

a warrant affidavit does not itself establish a lack of probable cause.  *See Bello v. Johnson*,

442 F. App'x 477, 480 (11th Cir. 2011) (per curiam) (in § 1983 malicious prosecution

action, the plaintiff needed to show that, "absent the alleged misrepresentations or

omissions [in the warrant affidavit], probable cause would have been lacking"

(quotation marks omitted)); *see also United States v. Kapordelis*, 569 F.3d 1291, 1309 (11th

Cir. 2009) (explaining that a warrant will only be invalidated if, setting aside any

alleged misrepresentations or omissions, the remaining information in the warrant

affidavit does not support probable cause).

---

[3] Under Florida law, the issuance of an arrest warrant by a magistrate only establishes a conclusive presumption of probable cause if the defendant had the opportunity to be heard.  *Burns*, 502 So. 2d at 1220.  Because grand jury proceedings are *ex parte*, the district court did not treat the indictment as conclusive evidence of probable cause, but merely as some evidence that could be set aside for "good reason."  Dkt. 371, at 14.

The district court relied on *Glass v. Parrish*, 51 So. 2d 717 (Fla. 1951), where the Florida Supreme Court explained that the "good faith of the defendant is an essential element in the defense of probable cause," such that even where the defendant "shows reasonable grounds of suspicion," that will not shield him from liability if it is "apparent that he did not himself believe in the guilt of the accused." *Id.* at 719-20 (quotation marks omitted); Dkt. 371, at 16.[4] The district court found no facts indicating that the FBI special agents did not subjectively believe in plaintiff's guilt. In fact, both Special Agent Janssen and Special Agent Ferlazzo testified that they continue to believe that plaintiff is guilty. Dkt. 409, at 163-64; Dkt. 412, at 169.

But even putting aside the significant legal problems with the district court's approach, the court clearly erred in finding that Special Agent Janssen made "material misrepresentations" to the grand jury and that, as a result, the individual overt acts were not supported by probable cause. Dkt. 371, at 25-26. The court did not identify any misrepresentations made by Special Agent Janssen. In its analysis of Overt Act 1, the court expressly found that Special Agent Janssen testified that plaintiff sent money to Akbar Hussain, but "[n]o testimony or information was provided to the grand jury about the identity of Akbar Hussain." *Id.* at 17. Although the court concluded that the government lacked probable cause to believe this transaction was part of a conspiracy, the court identified no material misrepresentation made to the grand jury.

---

[4] As noted *supra* p. 18, the Eleventh Circuit has characterized probable cause under Florida law as an objective test. *Rankin*, 133 F.3d at 1433.

*Id.* at 17-20.  Likewise, the court identified no misrepresentation in its analysis of Overt Act 14, which alleged that on August 20, 2009, plaintiff and his father discussed sending money to the "Sharia people" and Hafiz then called for an attack on Pakistani officials.  *Id.* at 23-25.  Though the court concluded that the government lacked probable cause to believe that "Sharia people" referred to the Taliban, the court correctly noted that "[n]o testimony or information was given to the grand jury about the meaning of Sharia people."  *Id.* at 23-24.

Nor did the district court expressly identify any misrepresentation in its analysis of Overt Act 5, which alleged that plaintiff and his father "participated in a conversation in which Hafiz called for an attack" on the Pakistani Assembly that would resemble the 2008 suicide attack on the Marriott hotel in Islamabad.  Dkt. 371, at 20.  But the court did find that Special Agent Janssen "affirmed" to the grand jury that plaintiff and his father "discussed the need to repeat a violent incident and the need to have another violent incident like the suicide attack at the Marriott Hotel" in Islamabad.  *Id.* at 21.

The district court seemed to refer to two responses given by Special Agent Janssen before the grand jury.  The prosecutor presented Special Agent Janssen with the transcript of the relevant call and asked whether plaintiff and his father "discuss the need to repeat a violent incident" and "call for the need to have another violent incident" like the Marriott hotel suicide attack.  Dkt. 362-3, at 45-47 (Joint Ex. 3).  The agent responded that "they do" in both instances, and did not clarify that it is

Hafiz, not plaintiff, who called for violence. *Id.* at 46-47 (Joint Ex. 3). The district court did not find that Special Agent Janssen's imprecision was "intentional or reckless," but in any case, it was not material. *See Paez*, 915 F.3d at 1287 (explaining that in the Fourth Amendment context, this Court first asks whether "there was an intentional or reckless misstatement or omission" in the warrant affidavit and then it "examine[s] the materiality of the information by inquiring whether probable cause would be negated if the offending statement was removed"). Special Agent Janssen's responses were not material because they cannot "be said to have resulted in deception." *Johnson v. State*, 660 So. 2d 648, 656 (Fla. 1995). The grand jury was presented with a transcript of the call at issue, and the true bill they returned clearly indicated that Hafiz, not plaintiff, called for violence. Dkt. 362-1, at 7 (Joint Ex. 1); Dkt. 362-3, at 45 (Joint Ex. 3) (introducing the call transcript as Grand Jury Exhibit 15).

The district court similarly did not identify any misrepresentation in its analysis of Overt Act 6, which alleged that plaintiff wired $500 to Amina. Dkt. 371, at 21-23. But the court found that Special Agent Janssen "testified [that] the money was solicited for the Pakistani Taliban but was sent to Amina to avoid suspicion or scrutiny" and that probable cause did not support that testimony. *Id.* at 21-22. Again, the district court did not offer any findings or analysis as to whether the statement it attributed to Special Agent Janssen was intentional or reckless or whether it was material to the grand jury's decision to indict. But in any event, the district court was

mistaken.  Special Agent Janssen offered no testimony regarding the purpose of the $500 plaintiff sent to Amina.  *See* Dkt. 362-3, at 59-61 (Joint Ex. 3) (discussing wire transfer to Amina).  Special Agent Janssen testified that the co-conspirators discussed sending money to Amina to "avoid suspicion or scrutiny" in response to the prosecutor's question regarding whether, "during other calls during this time period," the co-conspirators talked about why they sent money to Amina.  *Id.* at 62 (Joint Ex. 3).  But neither the prosecutor's question nor Special Agent Janssen's response identified plaintiff as participating in such discussions.  And Special Agent Janssen's testimony clearly indicated that co-conspirators other than plaintiff were recorded discussing their plans to send money to Amina.  *See id.* at 53-54 (Joint Ex. 3).

The district court thus erred factually, in concluding that Special Agent Janssen made material misrepresentations to the grand jury, and legally, in holding that such misrepresentations established the absence of probable cause.  The facts and evidence available to the FBI at the time of the indictment amply supported the agents' reasonable belief that plaintiff had likely committed a crime.  Plaintiff failed to carry his burden of proving the absence of probable cause for his prosecution, and the district court's judgment should accordingly be reversed.

## III.    The District Court Erred in Awarding Plaintiff Damages for Decisions Made by Government Attorneys.

After a separate bench trial on damages, the district court awarded plaintiff $6.28 million, including $6 million for emotional distress.  Dkt. 396, at 21.  The

district court found that plaintiff established that he has suffered and continues to suffer emotional distress as a result of his arrest and detention. *Id.* at 16. The court further found that plaintiff was entitled to "additional compensation" for the "impact of the Government's dismissal of the charges against him without prejudice" and the "Government's decision to maintain that he was guilty of a crime" during the civil trial. *Id.* at 16-17. That was error for two reasons.

First, the United States has not waived its sovereign immunity for such damages. The FTCA's waiver is limited to malicious prosecution claims based on the "acts or omissions" of investigative or law enforcement officers. 28 U.S.C. § 2680(h). The decision to dismiss charges against plaintiff without prejudice was made by prosecutors, who are not "investigative or law enforcement officers" within the meaning of section 2680(h). *Trupei*, 304 F. App'x at 783-84; *see* Dkt. 410, at 134 (Special Agent Janssen testifying that he was not involved in the decision to drop charges); Dkt. 412, at 192 (same for Special Agent Ferlazzo). Similarly, the decision to maintain plaintiff's guilt in the civil action was made by government attorneys in the U.S. Attorney's Office, who are not investigative or law enforcement officers. The court thus erred by awarding damages arising from the acts of individuals for whom the United States has not waived its sovereign immunity. *See Arnsberg v. United States,* 757 F.2d 971, 977 (9th Cir. 1985) (explaining that sovereign immunity barred the plaintiff's claim for false imprisonment where the plaintiff's injuries were not caused by law enforcement officers).

37

Second, the district court erred because damages arising from the government's dismissal without prejudice and its civil litigation strategy are not recoverable in a malicious prosecution action under Florida law.  Damages in a malicious prosecution action in Florida are limited to the "natural and probable consequences of the action complained of." *Ware*, 971 F. Supp. at 1470-71 (quoting Fla. Jur. 2d *False Imprisonment* § 39 (1995)).  Florida courts thus permit a malicious-prosecution plaintiff to recover damages for arrest, "which is a normal incident of a criminal prosecution," and confinement, which is "caused by the malicious prosecution." *Erp v. Carroll*, 438 So. 2d 31, 40 (Fla. Dist. Ct. App. 1983).  By contrast, neither the government's dismissal of charges without prejudice nor its decision to maintain plaintiff's guilt as part of its defense in this civil case are "natural and probable consequences" of criminal prosecution.

The district court thus erred in awarding plaintiff "additional compensation" based on litigation decisions made by government attorneys.  Because the district court's opinion does not indicate what proportion of the $6 million award for emotional distress is compensation for these asserted injuries, the district court's judgment should, at a minimum, be vacated and the case remanded for reconsideration of damages.

## CONCLUSION

For the foregoing reasons, this Court should reverse the district court's judgment or, in the alternative, vacate the judgment and remand for further proceedings.

Respectfully submitted,

BRETT A. SHUMATE
*Assistant Attorney General*

HAYDEN P. O'BYRNE
*United States Attorney*

BRAD HINSHELWOOD

*s/ Sarah N. Smith*

SARAH N. SMITH
*Attorneys, Appellate Staff*
*Civil Division, Room 7533*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 305-0173*
*Sarah.N.Smith@usdoj.gov*

June 2025

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 9,944 words.  This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

*s/ Sarah N. Smith*
Sarah N. Smith

## CERTIFICATE OF SERVICE

I hereby certify that on June 16, 2025, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Eleventh Circuit by using the appellate CM/ECF system.  Service will be accomplished by the appellate CM/ECF system.

*s/ Sarah N. Smith*

Sarah N. Smith